IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SLEP-TONE ENTERTAINMENT
CORPORATION, a North Carolina
Corporation,

    Plaintiff,

v.

GOLF 600 INC, a New York corporation;
BOXERS ENTERPRISES, LLC, a New York
limited liability company; RINGDALE
ENTERPRISES INC., a New York
corporation; Mab Bar Inc., a New York
corporation; CLONTARFSCOUSE LLC, a
New York limited liability company; MAXS'
PUB INC., a New York corporation; and
TARVIA II RESTAURANT CORP, a New
York corporation,

    Defendants.

Case No.:

## COMPLAINT

Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, complains against Defendants Golf 600 Inc., Boxers Enterprise LLC, Ringdale Enterprises Inc., Mab Bar Inc., Clontarfscouse, LLC, Maxs' Pub Inc., and Tarvia II Restaurant Corp. and alleges as follows:

### SUMMARY

1.     This is an action by the Plaintiff for trademark infringement and federal unfair competition in which the Defendants are accused of knowingly benefiting from the use of pirated, counterfeit karaoke accompaniment tracks belonging to the Plaintiff.

1

2.  The Defendants' liability arises from their hiring of one or more karaoke operators who make use of pirated, counterfeit karaoke accompaniment tracks to produce karaoke shows at the Defendants' venue(s), and from continuing to hire and utilize the services of those karaoke operator(s), having previously been informed of the infringing nature of the operator(s)' services. The Defendant derives a significant financial benefit from the use of this pirated material in the establishment(s) it controls.

## JURISDICTION AND VENUE

3.  This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4.  This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

5.  This Court has supplemental jurisdiction over the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), in that the state-law claims are so related to the Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

6.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the Defendants reside within New York and their principal place of businesses are within the State and the United States District Court for the Southern District of New York.

7. This Court has both specific and general personal jurisdiction over the Defendants in that they are all commercial enterprises operating one (1) or more eating and/or drinking establishments in this State and judicial district and in that the Defendants' liability arises from their operation of those establishments in this State and judicial district.

## THE PLAINTIFF

8. Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

9. Defendant Golf 600 Inc. ("Golf 600") is a New York corporation that operates an establishment known as "Barney McNabb's" in Yonkers, New York.

10. Defendant Boxers Enterprises, LLC ("Boxers") is a New York limited liability company that operates an establishment known as "Boxers HK" in New York, New York.

11. Defendant Ringdale Enterprises Inc. ("Ringdale") is a New York corporation company that operates an establishment known as "Davy Byrnes" in Port Chester New York.

12. Defendant Mab Bar Inc. ("Mab Bar") is a New York corporation that operates an establishment known as "The Toolbox" in New York, New York.

13. Defendant Clontarfscouse LLC ("Clontarfscouse") is a New York limited liability company that operates an establishment known as "The River Roadhouse" in Hastings-on-Hudson, New York.

14. Defendant Maxs' Pub Inc. ("Maxs' Pub") is a New York corporation that operates an establishment known as "Maxwell's Pub" in Elmsford, New York.

15. Defendant Tarvia II Restaurant Corp. ("Tarvia II") is a New York corporation that operates an establishment known as "La Lanterna Ristorante" in Yonkers, New York.

16.  The Defendants in this action both operate a commercial establishment(s) to which karaoke entertainment services are provided by a third party as entertainment for the Defendants' patrons, as an inducement for their patronage and purchase of food, drink, and other concessions.

## FACTS

### *THE RIGHTS OF THE PLAINTIFF*

17.  Plaintiff SLEP-TONE is the owner of U.S. Trademark Registrations No. 1,923,448 and No. 4,099,045, both for the trademark SOUND CHOICE.

18.  Plaintiff SLEP-TONE is also the owner of U.S. Trademark Registrations No. 2,000,725, and No. 4,099,052 both for a display trademark as follows:



19.  Plaintiff SLEP-TONE has, for the entire time its marks ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendant, with notice of its federal registrations through the consistent display of the symbol ® with its marks as used.

20.  Plaintiff has been using one or more of its marks in commerce since 1995 in connection with goods and/or services in or closely related to the karaoke industry.

21.  Slep-Tone is the owner of distinctive and protectable Sound Choice trade dress associated with its graphical displays (the "SC Trade Dress"). This distinctive and protectable SC Trade Dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (2) the Sound Choice Marks; and (3) the use of particular

styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

22. Slep-Tone has used the SC Trade Dress continuously and substantially exclusively for a period of decades.

23. The individual and collected elements of the SC Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

24. The aforementioned SC Trade Dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by this Defendant are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the SC Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

25. The elements of the SC Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

## *THE ACTIVITIES OF THE DEFENDANTS AND THEIR SUPPLIERS*

26. The Defendants have contracted with one or more suppliers known as karaoke operators, including, but not necessarily limited to, Justine Davis dba Nightstar DJ and Karaoke, who provides karaoke entertainment shows at the Defendants' establishments.

27. These karaoke shows consist of participatory entertainment, in which individual patrons or groups of patrons sing popular songs while accompanied by recorded accompaniment music.

28. During each of the karaoke shows performed at the Defendants' establishment(s), the karaoke operator(s) caused a number of songs to be played for the purpose of accompanying individual patrons or groups of patrons while they sang.

29. Each song within the recorded accompaniment music, together with graphical displays of the lyrics and other material synchronized to the music, is a "karaoke accompaniment track."

30. With respect to the Defendants' establishments, a substantial portion of the karaoke accompaniment tracks used to put on the karaoke shows were files marked with the Plaintiff's Marks.

31. However, the Plaintiff did not create the karaoke accompaniment tracks actually used by the karaoke operators.

32. Rather, the karaoke operator(s) either made the tracks themselves by duplicating them from an original or non-original source or acquired the tracks from another person who duplicated or derived them from an original or non-original source.

33. The karaoke operator(s) or other persons identified in the preceding paragraph were not authorized to make duplicates of the Plaintiff's karaoke accompaniment tracks.

34. The karaoke operator(s) or other persons so identified were not authorized to use the Sound Choice Marks in any fashion, or apply the Sound Choice Marks to any product, including but not limited to any karaoke accompaniment track(s).

35. The karaoke operator(s) were not authorized to obtain or use near duplicates of the Plaintiff's karaoke accompaniment tracks.

36. The karaoke operator(s) or other persons did not pay any royalties or fees to the Plaintiff or to the upstream owners of copyright in the underlying musical works for the privilege of conducting their duplication activities.

37. The karaoke operator(s) or other persons did not pay any royalties or fees to the Plaintiff for the privilege of displaying the Sound Choice Marks during the karaoke shows.

38. As a result of the karaoke operator(s)' (or other persons') duplication activities, the karaoke operator(s), and thus the Defendants, have been supplied with counterfeit karaoke accompaniment tracks.

39. Because the duplication activities were not undertaken with the Plaintiff's knowledge or authorization, the Plaintiff was unable to control the quality of the counterfeit karaoke accompaniment tracks.

40. In most if not all cases, the counterfeit karaoke accompaniment tracks are degraded from the original quality, such that the high quality of the Plaintiff's karaoke accompaniment tracks is no longer as evident as it is when original media are used.

41. The Defendants realized substantial revenues and profits from the sale of concessions to patrons during the performance of karaoke shows at which counterfeit karaoke accompaniment tracks were used and counterfeits of the Sound Choice Marks were displayed.

42. The activities of the Defendants are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, usually months and in many cases years.

43. The acts attributable to the Defendants are of a commercial nature, in that the acts were principally motivated by the transfer of money by, between, and among the various participants in the karaoke shows in connection with the services being provided.

## *WILLFUL INFRINGEMENT*

44. The Defendants have the right and ability to control whether its contractor(s) uses authentic or counterfeit materials to provide services.

45. In or around October of 2014, the Plaintiff and affiliates of the Plaintiff informed the Defendants of the infringing and counterfeit character of their contractor(s)' karaoke accompaniment tracks.

46. The Plaintiff has offered the Defendants the opportunity to enter into its free Verified Compliance Safe Harbor Program, a program that protects venues from liability for the acts of their contractors in exchange for requiring their contractors to provide information about their karaoke systems to enable the Plaintiff and the venues to assess whether those contractors are operating legally.

47. The Plaintiff also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials or not.

48. As a result of the Plaintiff's efforts, the Defendants have actual knowledge of the infringing and counterfeit nature of their contractor(s)' karaoke materials.

49. Despite that knowledge, the Defendants have failed and refused to terminate the services of their contractor(s).

50. Despite that knowledge, the Defendants have continued to derive a significant financial benefit from the karaoke shows provided at their establishments.

## THE HARM TO THE PLAINTIFF

51. As a manufacturer of karaoke accompaniment tracks, the Plaintiff has expended vast sums of money to re-record popular songs in karaoke format.

52. The Plaintiff's expenditures, which total in the tens of millions of dollars over a 29-year period, include money spent to build a world-class recording studio, to hire musicians, to acquire appropriate licenses, to manufacture compact discs, to pay ongoing royalties, and to advertise and market its products, among other items.

53. The Plaintiff generates revenue by selling and licensing authentic original materials on compact discs to the consumers of its products, which include home users, professional karaoke operators, and venues that operate their own karaoke systems.

54. There is, in this judicial district and in the United States generally, a market for karaoke entertainment, in that there is a significant number of persons who wish to be entertained by viewing and participating in karaoke shows.

55. The Defendants seek to serve that market by providing karaoke shows at their venue(s) at no or little direct cost to the patrons, in exchange for patronage that includes the purchase of food, alcohol, and/or other concessions.

56. In order to serve that market, the Defendants have contracted, at some expense, with professional karaoke operator(s) who provide the karaoke shows to the patrons at the Defendants' establishments.

57. Rather than paying fair-market prices for the services of karaoke operators who have legally acquired karaoke accompaniment tracks for use in providing karaoke shows, the Defendants have instead contracted with pirate karaoke operator(s).

58. The Defendants have benefited from below fair-market pricing for the services they receive, because pirate karaoke operators can afford to charge less money for their services than fully legal karaoke operators can afford.

59. The pirate karaoke operators can afford to charge less because, unlike the fully legal operators, the pirate operators did not spend the thousands of dollars necessary to acquire legal music, yet they nonetheless offer the same songs as, if not many more songs than, the legal karaoke operators.

60. The Defendants' willingness to pay pirate karaoke operator(s) to provide karaoke shows at their establishments, rather than hiring legal operators at a higher expense, encourages previously legal operators to become pirate operators in order to reduce their costs and maintain profitability and/or to remain in business.

61. As a direct result of the Defendants' participation in the market for pirate karaoke, the Plaintiff has experienced significantly reduced sales of its legitimate products, as would-be purchasers of the Plaintiff's legal products eschew those purchases in favor of obtaining counterfeit product at a greatly reduced cost.

62. The Defendants' knowing use and benefit from materials pirated from the Plaintiff's original materials, has deprived the Plaintiff of revenue it would have received from the purchase or licensing of original materials.

*PIRACY INVOLVING KARAOKE TRACKS OF OTHERS*

63. The pirate karaoke operator(s) who provide services to the Defendants do not limit their piracy to the Plaintiff's tracks.

64. Specifically, the pirate karaoke operator(s) has also committed acts of piracy of other manufacturers' accompaniment tracks, utilizing the words, names, symbols, and other devices associated with those manufacturers, upon information and belief without authorization.

65. The Defendants' knowledge of the infringing character of their contractor(s)' activities with respect to SOUND CHOICE®-branded karaoke accompaniment tracks applies with equal force to tracks belonging to other manufacturers.

## DAMAGES

66. The Defendants' unauthorized use of and benefit from the use of the Sound Choice Marks has damaged the Plaintiff both in the aggregate and individually.

67. The Defendants have damaged the Plaintiff in an amount of at least $100,000.00.

68. Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to the Plaintiff and to other manufacturers, the Defendants have cost the Plaintiff in excess of $100,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

## FIRST CLAIM FOR RELIEF
### *TRADEMARK AND SC TRADE DRESS INFRINGEMENT UNDER 15 U.S.C. §1114*

69. Slep-Tone repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

70. Defendants knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks and the Sound Choice trade dress in connection

with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the SC Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the SC Trade Dress during the provision of those services.

71. Use of the Sound Choice Marks and the SC Trade Dress by Defendant were "in commerce" within the meaning of the Trademark Act of 1946 as amended.

72. Slep-Tone did not license Defendants to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the SC Trade Dress in connection with the provision of their services.

73. Use of the Sound Choice Marks and the SC Trade Dress by Defendant in this manner is likely to cause confusion, or to cause mistake, or to deceive their customers and patrons into believing that their services are being provided with the authorization of Slep-Tone and that their music libraries contain bona fide Sound Choice accompaniment tracks.

74. The acts of Defendants were willful, knowing, and intentional.

75. Slep-Tone has been damaged by these infringing activities.

76. Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

77. Slep-Tone repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

78. On each occasion Defendants permitted an unauthorized counterfeit duplicate of a Slep-Tone accompaniment track to be played during a karaoke show at a given establishment,

the Sound Choice Marks and the SC Trade Dress were displayed in connection with the Defendants' contractor's('s) karaoke services.

79. The display of the Sound Choice Marks and the SC Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendants' contractor's services and commercial activities.

80. The display of the Sound Choice Marks and the SC Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased or otherwise licensed by Defendants' contractor.

81. Defendants' use of Slep-Tone's marks and SC Trade Dress in this fashion or in a more appropriate fashion would have inured to the benefit of Slep-Tone if Defendants had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

82. Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' uses.

83. On each occasion when Defendant permitted an accompaniment track pirated from a manufacturer other than Slep-Tone to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendants' karaoke services.

84. Upon information and belief, Defendants' contractor(s) use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track,

when in fact Defendants' contractor(s) or an upstream but unauthorized provider of the track was the origin of that track.

85. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Defendants' contractor(s) acquired in a legitimate manner.

86. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Defendants' contractor(s).

87. Defendants' use of the false designations of origin in this fashion damages Slep-Tone by enabling Defendants, through its contractor(s), to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers, can provide or obtain them.

88. The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

89. Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' false designations of origin relating to other manufacturers.

90. Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### THIRD CLAIM FOR RELIEF
### *UNFAIR AND DECEPTIVE TRADE PRACTICE UNDER NEW YORK GENERAL BUSINESS LAW § 349*

91. Slep-Tone repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

92. On each occasion when Defendants' contractor(s) caused a Sound Choice recording to be played during a karaoke show, the Defendants' contractor(s) displayed the Sound Choice Marks in connection with the Defendants' contractor(s')'s karaoke services.

93. The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the Plaintiff sponsored or approved the Defendants' contractor(s')'s services and commercial activities.

94. The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Plaintiff or its licensee(s) and legally purchased by the Defendants' contractor(s).

95. Defendants' conduct constitutes unfair and deceptive acts or practices in violation of N.Y.G.B.L. § 349.

## FOURTH CLAIM FOR RELIEF
### *UNFAIR COMPETITION UNDER THE COMMON LAW OF NEW YORK*

96. This claim arises under the common law of the State of New York relating to trademark infringement and unfair competition. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and pursuant to 28 U.S.C. § 1367 under the doctrine of supplemental jurisdiction. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

97. Slep-Tone repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

98. As fully set forth above, the Sound Choice Marks are indicative of origin, relationship, sponsorship, and/or association with Plaintiff. The purchasing public is likely to attribute Defendants' contractor('s)'s use of the Sound Choice Marks as a source of authorization, endorsement, and/or sponsorship of Defendants' services and use of these marks.

99. Upon information and belief, Defendants have intentionally appropriated the Sound Choice Marks with the intent of causing confusion, mistake, and deception as to their relationship with Slep-Tone and with the intent to palm themselves off, through their contractor('s)'s use of the Sound Choice Marks as being authorized by, sponsored by, approved, by or licensed by Slep-Tone and, as such Defendants have committed trademark infringement and unfair competition under the common law of this state.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Slep-Tone prays for judgment against each of the Defendants, and that the Court:

A. Find that the Defendants, by virtue of their knowledge, ability to control, and benefit from acts of infringement of the federally registered Sound Choice Marks, directly committed by its contractor(s), is vicariously or otherwise indirectly and derivatively liable for those acts;

B. Find that the Defendants have engaged in unfair competition against Plaintiff SLEP-TONE in violation of 15 U.S.C. § 1125(a);

C. Enter judgment against the Defendants and in favor of SLEP-TONE;

D. Find the that Defendants' activities were in all respects conducted willfully and for profit;

E. Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' conduct in infringing the Sound Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $100,000 for each establishment in which counterfeit karaoke accompaniment tracks were used to provide karaoke entertainment services;

F. Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), in an amount not less than $100,000 per Defendant, based upon the conduct of each of the Defendants;

G. Award to SLEP-TONE treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

H. Grant SLEP-TONE preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by the Defendants;

I. Grant SLEP-TONE preliminary and permanent injunctive relief against further false designations of origin by the Defendants with respect to words, names, and symbols associated with other manufacturers;

J. Award SLEP-TONE its costs of suit and attorney's fees, to the extent not awarded above; and

K. Grant SLEP-TONE such other and further relief as justice may require Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this the 22nd day of December 2014.

*/s/ Philip Z. Kimball*
Philip Z. Kimball
Attorney for Plaintiff

Philip Z. Kimball (PK1470)
Philip Z Kimball PLLC
111 Lawrence Street, Unit 6H
Brooklyn, NY 11201
Phone: (646) 801-8363
Fax: (212) 358-2517
Email: pzkimball@pzklaw.com